UNITED STATES of America ex rel. George R. JACQUES, Petitioner,

v.

Gary HILTON, Superintendent, New Jersey State Prison at Trenton, Respondent.

Civ. A. No. 76–1566.

United States District Court, D. New Jersey.

Dec. 17, 1976.

George R. Jacques, pro se.

Robert J. Genatt, Deputy Atty. Gen., East Orange, N. J., for respondent.

STERN, District Judge.

This is a petition for a Writ of Habeas Corpus to compel the release of George Jacques from state custody. Jacques was convicted of first degree murder after a four day jury trial in 1974. He was sen-

tenced to the mandatory term of life imprisonment. His conviction was affirmed on direct appeal by the Appellate Division in an unreported opinion. *State v. Jacques,* No. A–2875–73 (App.Div., Nov. 12, 1975). Certification was denied by the New Jersey Supreme Court. *State v. Jacques,* 71 N.J. 340, 364 A.2d 1072 (1976). Upon the denial of his petition for certification petitioner commenced the instant lawsuit. The State concedes, and the record demonstrates, that petitioner has exhausted his state remedies with respect to the claims he now advances. 28 U.S.C. § 2254(b); *Zicarelli v. Gray,* 543 F.2d 466 (3rd Cir. 1976) (*en banc*).

Petitioner was charged with the murder of Edmund Kornacki in Middlesex County Indictment No. 28–73. He pleaded not guilty to the charges. An initial trial ended in a mistrial after the jury had retired when it was discovered that one of the jurors had been exposed to a newspaper article concerning the case. Retrial followed immediately. The multiple assertions of error made by the petitioner require a review of the testimony adduced at the second trial, which resulted in his conviction.

On March 18, 1973, two boys discovered a body in a deserted wooded area of South Plainfield. Police investigation revealed that the decedent, identified as Edmund Kornacki, had been shot four times. One of the bullet wounds was in the back of the head. The other three wounds formed a small pattern on the back of the corpse. The surrounding earth was not disturbed. Three bullets were recovered from the ground immediately underneath the torso of the victim. The fourth bullet was removed from Kornacki's head at the time of the autopsy. Expert ballistics testimony established that all four bullets recovered from Kornacki's body had been fired from the same weapon. While the type of weapon could not be precisely identified from the markings on the slugs, the State's expert testified that the rifling marks were consistent with the inference that the weapon was a Czech .32 automatic pistol.

The next witnesses for the State were presented in order to cast light on Kornacki's state of mind immediately prior to his disappearance. His landlady and several friends indicated that he altered his established patterns of behavior in the days prior to his death. Craig Brizak, a friend of Kornacki's, further testified that Kornacki told him that he was in fear of petitioner and expected to be killed. Brizak described Kornacki as having been nervous. He testified that Kornacki gave him a stack of his most prized record albums, an unusual action, just before his death. The State contended that this action on the part of Kornacki was in the nature of a bequest. On cross-examination Brizak conceded that others had threatened Kornacki. The witness admitted that while he had reported the other threats to the police at the time of the initial investigation, he had not mentioned petitioner until some months later.

The murder weapon was not recovered by the authorities. The State, however, was able to present substantial circumstantial evidence linking such a weapon to petitioner. One informant described an incident at petitioner's house in February 1973. At that time petitioner was sprayed with water from a malfunctioning sump pump hose next to his house. The informant told police that petitioner, enraged, went to his car, took out an automatic pistol, and fired a round into the pump hose. On the basis of this information the police obtained a search warrant for the earth near the house. When the warrant was executed the earth around the house was excavated and a bullet was recovered. Comparative ballistics examination revealed that this bullet was fired from the weapon used to kill Kornacki.

The State next presented the testimony of Craig Smith. Smith testified that he was a close associate of petitioner during the winter of 1972–1973. He stated that petitioner owned a Czech .32 automatic at that time, and identified a State's exhibit as being of a similar make and model. Smith in fact testified that he had once been awakened by petitioner holding the gun to his head in a macabre sort of jest.

Smith told the jury that petitioner had a motive to kill Kornacki. Smith stated that Kornacki had frightened petitioner's sister-in-law in the autumn of 1972, and that petitioner and his brother had vowed to take vengeance. Smith testified to several attempts made by petitioner to locate Kornacki, with the expressed intention of beating him up or killing him. Smith himself was recruited to aid in these efforts to find Kornacki in February 1973. Smith recounted a conversation with petitioner during this period when petitioner stated that the "professional way" to kill someone was to shoot the victim in the back of the head and then to fire the remaining bullets into the torso.

Finally, Smith testified to two highly incriminating conversations with petitioner. The first of these conversations took place several days before Kornacki's disappearance. At that time petitioner showed Smith a piece of paper which had Kornacki's address on it. Petitioner indicated by word and gesture that he intended to make use of the information. The last conversation recounted by Smith took place on the day that the body was discovered. Smith testified that petitioner admitted the killing to him, and described the circumstances and a ruse used to lure Kornacki into petitioner's car. According to Smith, petitioner was in high spirits at the successful outcome of his efforts.

On cross-examination, the defense directly attacked Smith's credibility as a witness. The defense was at pains to review the rather substantial plea bargaining between Smith and the State with respect to other pending cases. The bargain included a prosecutorial recommendation of a non-custodial sentence on all pending cases, although Smith's potential exposure was in excess of twenty years.

In an effort to bolster Smith's credibility the State next presented the testimony of an expert polygraph examiner. The examiner described to the jury the formulation of a series of test questions which included

affirmative reference to the salient points of Smith's trial testimony. The examiner offered the unqualified opinion that Smith was telling the truth when he answered each of the test questions in the affirmative. The State then offered the gun from its labs, which was identified by Smith as having been similar to that owned by petitioner, into evidence and rested its case.

Petitioner offered the testimony of several witnesses from his job in an effort to establish an alibi for the estimated time of death based upon the medical evidence. Petitioner did not testify. After some nine hours of deliberation the jury found petitioner guilty of murder in the first degree.

Petitioner now claims that a variety of errors entitle him to a Writ of Habeas Corpus. His first claim is that the trial court erred in permitting the State to introduce hearsay evidence through the testimony of Craig Brizak relating to the decedent's state of mind. (Tr. 5/8/74, at 12–14) Petitioner further contends that the trial court erred in permitting the prosecutor to argue to the jury that such evidence could also be considered on the issue of identity. (Tr. 5/10/74, at 43) In support of his position petitioner relies upon the case of *United States v. Brown,* 160 U.S.App.D.C. 190, 490 F.2d 758 (1974). In the context of this proceeding, petitioner's argument is without merit.

▆ Petitioner contends here that although the evidence offered by Brizak might be admissible, in his case the trial court erred in not exercising its discretion to exclude. The admission of this testimony simply raises no federal constitutional issue. It was within the scope of the New Jersey Rules of Evidence, see N.J.R.Ev. 63(12). It would be admissible under the Federal Rules of Evidence, see F.R.Ev. 803(3). While the court in *United States v. Brown, supra,* reversed a federal conviction on similar grounds, it did not purport to lay down a constitutional rule in doing so. The Supreme Court has explicitly stated that the constitutionally guaranteed right of confrontation does not preclude the use of hearsay evidence, see *Dutton v. Evans,* 400

U.S. 74, 80–82, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). Similarly, even evidence admitted in violation of a state hearsay rule may not necessarily violate the right to confrontation. See *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The trial court's decision to receive the initial evidence presented by Brizak was well within the scope of discretion confided to the New Jersey courts. The subsequent argument by the prosecutor of which petitioner complains passed entirely without objection from the defense. *Cf. Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). No constitutional error was committed, and the first ground for relief is without merit.

▆ Petitioner next contends that the introduction of a weapon described by several witnesses as "similar to" the gun owned by petitioner was error. The admission of this weapon into evidence would be discretionary with either a New Jersey or a federal trial court. An adequate foundation was laid through the testimony of the ballistics expert and that of Craig Smith. The jury was explicitly told that the weapon came from the gun collection of the State Police. No possible constitutional error appears here.

▆ The third contention raised by the petitioner is that various errors were committed during the course of the trial court's charge. Petitioner first complains that four errors occurred during the trial court's charge to the jury, including an erroneous instruction on the use of prior inconsistent statements, an erroneous instruction on the use of prior convictions, inadequate instruction on the use of circumstantial evidence, and an instruction that any verdict reached had to be unanimous. None of these points were objected to by defense counsel at the time of the trial. After a careful review of the entire charge, see *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), this Court finds each and every one of the alleged claims of error to be insubstantial. In view of the acquiescence of the defense in the alleged "errors", there is absolutely no federal issue raised. See *Es-*

telle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976).

 Next, petitioner makes a variety of attacks on rulings of the trial court with respect to communications with the jury. Petitioner claims that the trial court erred when it complied with a jury request to have the testimony of Craig Smith and that of the polygraph examiner re-read. Petitioner contends that it was error for the trial court to refuse the defense request that such a reading be accompanied with the portion of the charge relating to their credibility. This contention is without constitutional basis. Petitioner next claims that the trial court erred in refusing a defense request that the jury be instructed to avoid all reportage, movies, television shows, documentaries or newspaper accounts of any crime during the duration of the trial. The trial court correctly required the jurors to avoid all publicity about the instant case. No more was constitutionally required, and this contention is not even coupled with a claim that this case was attended with any massive publicity. Similarly, the trial court refused to interrogate jurors on a daily basis concerning their adherence to his instructions. This too raises no claim for review on habeas jurisdiction, and in fact might well have been harmful, rather than helpful to petitioner.

 Finally, petitioner contends that he was denied due process of law in that the trial court refused his request to charge the jury on manslaughter. Such an instruction was utterly unwarranted under the circumstances of this case, a gangland style "execution", and raises no constitutional issue. See United States ex rel. Wilson v. Essex County Court, 406 F.Supp. 991, 999–1000 (D.N.J.1976); United States ex rel. Victor v. Yeager, 330 F.Supp. 802–805 (D.N.J. 1971); United States ex rel. Matthews v. Johnson, 503 F.2d 339 (3rd Cir. 1974) is clearly distinguishable.

 Petitioner next argues that he was deprived of exculpatory information concerning the plea bargaining between the State and Craig Smith. It is beyond question that the State has an obligation to disclose arrangements made to secure the testimony of a witness in a criminal proceeding. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); United States ex rel. Dale v. Williams, 459 F.2d 763 (3rd Cir. 1972). But the record of the instant case demonstrates that the full extent of such promises was brought to the attention of the jury both on direct and on cross examination. That the jury ultimately chose to reject the defense attack on the credibility of Smith's testimony does not raise an issue for a federal court on habeas jurisdiction.

 Petitioner further contends that he was denied due process by several rulings as to the conduct of the trial, including the failure to sequester jurors, the permission granted to a detective to remain at counsel table during trial after petitioner alleged that he might be called as a defense witness (he was not). Neither of these rulings violated any constitutionally secured right. See Young v. Alabama, 443 F.2d 854 (5th Cir. 1971), cert. denied, 405 U.S. 976, 92 S.Ct. 1202, 31 L.Ed.2d 251 (1972); United States ex rel. Mayberry v. Yeager, 321 F.Supp. 199 (D.N.J.1971); United States v. Weinberg, 345 F.Supp. 824 (E.D.Pa.1972), modified on other grounds, 478 F.2d 1351 (3rd Cir. 1972), cert. denied, 414 U.S. 1005, 94 S.Ct. 363, 38 L.Ed.2d 242 (1973); United States v. Rollins, 522 F.2d 160 (2nd Cir. 1975), cert. denied, 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976).

 Petitioner's next assertion of error is the admission into evidence of the expert testimony from the polygrapher who examined Craig Smith. Such evidence is still debated in a variety of jurisdictions, see United States v. Alexander, 526 F.2d 161 (8th Cir. 1975); United States v. Oliver, 525 F.2d 731 (8th Cir. 1975), cert. denied, 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743 (1976); United States v. Demma, 523 F.2d 981 (9th Cir. 1975). New Jersey permits such evidence to be introduced upon the knowing, voluntary and intelligent stipula-

tion of both parties, *State v. McDavitt,* 62 N.J. 36, 297 A.2d 849 (1972). Here the record discloses just such a voluntary, knowing and intelligent stipulation on the part of petitioner; see Tr. (Motion Hearing) 29, 33–35, 36, 38. Under the circumstances of this case, the admission of the testimony presents no constitutional issue.

Petitioner then claims that the prosecutor's summation contained inflammatory material. This contention is without merit. *United States ex rel. Ford v. New Jersey,* 400 F.Supp. 587 (D.N.J.1975).

Finally, petitioner claims that he was denied due process when he was sentenced without the preparation of a presentence report. This contention is without merit. Petitioner specifically waived the preparation of such a report. The only discretion which the judge was in a position to exercise was whether to make the life term to be imposed consecutive to or concurrent with other sentences petitioner was serving. Petitioner refused to say anything at sentence. His tactical election to proceed to sentence without a report raises no issue here. See *Lawson v. Riddle,* 401 F.Supp. 410 (W.D.Va.1975).

For the foregoing reasons, petitioner's petition for a Writ of Habeas Corpus will be denied.